UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

RENETTA L. TAYLOR                                                                                    PLAINTIFF

v.                                                                                    CIVIL ACTION NO. 3:13-CV-00361-CRS

JEWISH HOSPITAL & ST. MARY'S
HEALTHCARE, INC., ET AL.                                                                             DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court on motions for summary judgment filed by Defendants Jewish Hospital and St. Mary's Healthcare, Inc. ("Jewish") (DNs 13, 33), and University Medical Center ("UMC") (DNs 18, 34) (collectively "Defendants"). For the reasons set forth below, the court will:

1) deny Jewish's Motion for Summary Judgment in part (DN 13);
2) grant Jewish's Motion for Summary Judgment in part (DN 33); and
3) grant UMC's Motion for Summary Judgment in full (DNs 18, 34).

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed. Plaintiff Renetta L. Taylor ("Plaintiff") instituted this action as the administratrix of the estate of her late son Brandon Pillow ("Pillow"). In the early morning hours of April 23, 2011, Pillow presented himself for treatment at Jewish's emergency department, complaining of severe radiating pain in his upper right abdomen and left shoulder. Pillow was seen by Dr. Anne Lorraine Brady ("Dr. Brady"), who took his temperature and ordered a Complete Blood Count ("CBC"). Pillow's temperature

1

was 100.1 degrees, but the results of the CBC showed a normal white blood count. Dr. Brady then ordered an abdominal and pelvic Computed Tomography ("CT") Scan without contrast. Once the CT scan was complete, Dr. Brady forwarded the results to Radiologist Dr. R.G. Waggener ("Dr. Waggener"). Based on his review, Dr. Waggener diagnosed Pillow with bilateral lung base pneumonia, primarily affecting his right lung. After informing Pillow of the diagnosis, Dr. Brady discharged Pillow and prescribed him Bactrim as an antibiotic.

On April 25, 2011, Pillow returned to Jewish's emergency department, where he was seen by Dr. Terry McGann ("Dr. McGann"). Pillow continued to complaint of sharp pain in his chest, which he explained was exacerbated by coughing and deep breathing. Although Pillow no longer had a fever, Dr. McGann ordered a chest x-ray. After reviewing the x-ray, Dr. McGann prepared the following "Radiology Interpretation:"

> Radiology report has been reviewed. Infiltrate right base. Pt. was seen here 2 days ago and had extensive workup. His blood cultures were neg. His CXR today shows more dense infiltrates rt. Base. The one from two days ago was read as negative. Will switch to Cipro if he can afford the $4.00.

After confirming that he could afford it, Dr. McGann prescribed Pillow Ciprofloxacin and discharged him with instructions to return to the emergency department if his symptoms worsened or if he developed shortness of breath or chest pain.

On April 28, 2011, Pillow presented himself for treatment at UMC's emergency department, where he was seen by second-year resident Dr. Robert McKnight ("Dr. McKnight"). Pillow continued to complain of breathing problems and indicated that his pain level was a "10" on a scale of 1 to 10. After taking his temperature and ordering a CBC, Dr. McKnight determined that Pillow did not have a fever and had a normal white blood count. Accordingly, Dr. McKnight ordered a chest x-ray, which was ultimately reviewed by radiologist Dr. Kragha. In his report, Dr. Kragha indicated that the x-ray

2

exhibited "Blunting of both costophrenic angles, right much greater than left, suggestive of atelectasis, infiltrates and pleural effusion." After reviewing Dr. Kragha's report, Dr. McKnight diagnosed him with atypical pneumonia and prescribed him Amoxicillin as an antibiotic, instructing him to return to the emergency department if his conditions worsened.

On April 30, 2011, Pillow was discovered collapsed on the floor of his grandmother's home. Pillow was immediately rushed to Jewish's emergency department, where he was pronounced dead at 4:29 P.M. On May 1, 2011, Dr. Donna Stewart ("Dr. Stewart") performed an autopsy of Pillow on behalf of the Jefferson County Coroner. According to Dr. Stewart's report, the cause of Pillow's death was pulmonary thromboembolism, which resulted from two pulmonary emboli present in his right lung.

## PROCEDURAL HISTORY

On May 17, 2011, Plaintiff filed the present action in Jefferson County Circuit Court, alleging medical negligence against Defendants Jewish and UMC based on their alleged failure to properly diagnose Pillow's condition. On March 22, 2013, Defendants removed the action on the basis of federal question jurisdiction, arguing that Plaintiff's assertion of an Emergency Medical Treatment and Active Labor Act ("EMTALA") claim in her Fourth Amended Complaint presented a federal question sufficient to confer jurisdiction under 18 U.S.C. § 1331. Subsequently, Plaintiff moved to remand the action on the grounds that she did not intend to assert an independent EMTALA claim, but instead merely sought to incorporate EMTALA's standard of care into her state-law medical negligence claim. On October 31, 2013, we denied the motion to remand, holding that Plaintiff had asserted an independent claim for relief under EMTALA sufficient to establish federal question jurisdiction.

3

**STANDARD**

Before granting a motion for summary judgment, the Court must find that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of establishing the nonexistence of any issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), a burden which may only be satisfied by "citing to particular parts of materials in the record..." or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). If the moving party satisfies this burden, the burden of production shifts to the non-moving party, who must then identify evidence demonstrating the existence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 322.

In resolving a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the non-moving party fails to satisfy its burden of counterproduction, the court must grant the motion for summary judgment.

**DISCUSSION**

The Court will address the motions for summary judgment in turn.

**i. Jewish's Motion for Summary Judgment**

    a. *Medical Negligence*

Jewish argues that summary judgment is warranted on Plaintiff's medical negligence claim because there is no genuine dispute that Physicians in Emergency Medicine ("PEM")[1] and its physician-employees are independent contractors, rather than Jewish's actual or ostensible agents.[2] In support of this argument, Jewish relies on the following undisputed facts:

1) Pillow signed a consent form provided by Jewish wherein he acknowledged his understanding that "physicians… are not employees of this facility but rather are independent contractors for which this facility is not responsible;"
2) the Agreement between Jewish and PEM states that PEM "is an independent contractor for the furnishing of Physicians… who agree to render emergency medical services to [Jewish]…. [N]one of the Physicians… provided by [PEM] are employees, independent contractors, or agents of [Jewish]" (Agreement, DN 17, at 7);
3) the Agreement provides that Jewish will insure its own staff, while PEM will be responsible for insuring its physicians;
4) the Agreement provides that PEM will bill separately for its services and determine its own fee schedule;
5) the Agreement provides that PEM will be solely responsible for compensating its physician-employees, including withholding taxes and providing benefits.

In addition, Jewish argues that its lack of control over PEM and its physician-employees weighs in favor of the conclusion that they were not Jewish's actual agents.

In response, Plaintiff argues that Jewish exercised significant control over PEM by retaining authority over the hiring and termination of its physician-employees. Specifically, Plaintiff maintains that Jewish's authority under Section III of the Agreement to terminate PEM physicians in its sole discretion, as well as its authority under Section II.1 to require that all physicians hired by PEM meet Jewish's eligibility criteria, is more than sufficient control to

---

[1] PEM is an independent group of emergency room physicians responsible for treating patients who present for medical care at Jewish's emergency departments. Pursuant to a written agreement (the "Agreement") entered into between Jewish and PEM, PEM is charged with "provid[ing] physicians to render emergency medical services" at Jewish's emergency departments located on its Jewish Hospital and Jewish Hospital Medical Center South campuses. (Agreement, DN 17, at 1).

[2] Because Plaintiff does not address Jewish's arguments related to ostensible agency, the Court will restrict its analysis to whether PEM and its physician-employees were the actual agents of Jewish.

5

render PEM physicians its actual agents. In addition, Plaintiff argues that Jewish exercised further control via its bonus incentive program whereby PEM physicians may receive additional compensation based on the quality of their performance with respect to certain performance metrics defined by Jewish. Finally, Plaintiff emphasizes that Jewish not only provides the instrumentalities, tools, and the place of work for PEM physicians, but also takes responsibility for obtaining signed consent forms from patients treated by PEM physicians. Given that PEM has delegated these significant aspects of its responsibilities for providing patient care, Plaintiff argues that it is clear that Jewish and PEM share an employer-employee relationship. Citing *Shofner v. Baptist Healthcare Affiliates, Inc.*, 2003 WL 22025906 (Ky. Ct. App. Aug. 29, 2003), Plaintiff argues that these factors taken together are sufficient to raise a genuine issue of material fact concerning whether PEM and its physician employees were Jewish's actual agents.

Under Kentucky law, "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *McAlister v. Whitford*, 365 S.W.2d 317, 319 (Ky. 1962). Under the common law doctrine of *respondeat superior*, "a principal is vicariously liable for damages caused by torts of… an agent or subagent, other than an independent contractor, acting on behalf of and pursuant to the authority of the principal." *Williams v. Kentucky Dep't of Educ.*, 113 S.W.3d 145, 151 (Ky. 2003). In determining whether a person is acting as another's agent or independent contractor, the following factors must be considered:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer; and

(i) whether or not the parties believe they are creating the relationship of master and servant.

*Sam Horne Motor & Implement Co. v. Gregg*, 279 S.W.2d 755, 756–57 (Ky. 1955). Among these factors, "the chief criterion is the right to control the details of the work." *Sturgill v. Barnes*, 300 S.W.2d 574, 577 (Ky. 1957) Thus, a person will generally be deemed an independent contractor if he or she "is free to determine how work is done" while "the principal cares only about the end result." *Nazar v. Branham*, 291 S.W.3d 599, 607 (Ky. 2009).

After considering all relevant factors, the Court concludes that there remains a genuine issue of material fact regarding whether PEM and its physician employees were the actual agents of Jewish. Although several of the factors weigh in favor of the conclusion that PEM and its physician employees were independent contracts, the level of control exercised by Jewish over the work performed by the physicians outweighs these countervailing considerations such that the Court cannot conclude as a matter of law that PEM physicians were nothing more than independent contractors.

Among the factors that weigh in favor of concluding that PEM and its physician employees are merely independent contractors are the following:

1) PEM physicians are engaged in the distinct occupation of practicing emergency medicine;

7

2) practicing medicine in Louisville, Kentucky is usually done by a specialist without supervision;

3) the skill required of emergency medical practitioners is high; and

4) Jewish and PEM clearly believed they were creating an independent-contractor relationship given the statement in Section IV of their Agreement that "The parties acknowledge that [PEM] is an independent contractor..." and that "[PEM] agrees none of the Physicians… provided by [PEM] are employees, independent contractors or agents of [Jewish]." (Agreement, DN 17, at 7).

As dictated by *Sturgill*, however, "the chief criterion is the right to control the details of the work." 300 S.W.2d at 577. With respect to the criterion of control, the following factors weigh in favor of concluding that PEM and its physician employees were Jewish's actual agents:

1) Jewish exercised indirect control over the details of the physicians work by designing an incentive compensation package whereby physicians were encouraged to perform certain job functions in a manner determined by Jewish. (Agreement, DN 17, at 9–10). Specifically, the Agreement provided for "incentive compensation based on the achievement by [PEM] of specific performance metrics… in the following areas: (i) Throughput; (ii) Patient Satisfaction; and (iii) Core Measures…" (Agreement, DN 17, at 9). In determining the amount of incentive compensation to be paid, the performance metrics were weighted such that "Throughput" determined 50% of the incentive compensation payable, while "Patient Satisfaction" and "Core Measures" accounted for 25% each. As defined in the Agreement, throughput is "a measure of the total time from the moment the patient presents [for treatment]… to the time of disposition, be that admission to the hospital or discharge to home or other care setting." Thus, the incentive compensation package indirectly exercised control over the physician's treatment of patients by encouraging speedy treatment and disposition; and

2) Section II.1 of the Agreement between Jewish and PEM required all PEM physicians to meet eligibility criteria established exclusively by Jewish (Agreement, DN 17, at 4);

3) Section III of the Agreement between Jewish and PEM granted Jewish the exclusive authority to terminate physicians in its "sole discretion" for a variety of reasons, including "[t]he willful engaging by a Physician… in conduct materially injurious to [Jewish] as reasonably determined by [Jewish]." (Agreement, DN 17, at 6).

Additionally, Jewish supplied the the instrumentalities, tools, and the place of work for PEM and its physician employees.

Given the extent of Jewish's control over the hiring and termination of PEM physicians, as well as its indirect control over the details of their work via the incentive compensation package, the Court concludes that there remains a genuine issue of material fact regarding whether PEM physicians were the actual agents of Jewish. For these reasons, and in accordance with *Shofner v. Baptist Healthcare Affiliates, Inc.*, 2003 WL 22025906 (Ky. Ct. App. Aug. 29, 2003), "We conclude that [Jewish] exerted sufficient control over the methods and materials used by [PEM and its physician employees] to raise a question about [their] status" as either independent contractors or employees. *Id.* at *5. Accordingly, the Court will deny Jewish's Motion for Summary Judgment with respect to Plaintiff's medical negligence claim.

    b. *EMTALA*

EMTALA "imposes two duties upon emergency room departments." *Hines v. Adair Cnty. Pub. Hosp. Dist. Corp.*, 827 F. Supp. 426, 431 (W.D. Ky. 1993). First, hospitals must provide all patients with "an appropriate medical screening examination within the capability of the hospital's emergency department." 42 U.S.C. § 1395dd(a). In this context, the term "appropriate" does not relate to the quality of the screening *per se*, but instead requires only that the screening is not "deficient in any way peculiar to the patient's characteristics." *Cleland v. Bronson*, 917 F.2d 266, 269 (6th Cir. 1990). In other words, the phrase "appropriate medical screening" means a screening that is not "in any way different than would have been offered to any other patient." *Id.* at 269.

Second, hospitals must stabilize any "emergency medical condition" prior to transferring or discharging a patient. 42 U.S.C. § 1395dd(b). As defined by 42 U.S.C. § 1395dd(e)(1)(A), the term "emergency medical condition" means:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-
>
> > (i) placing the health of the individual… in serious jeopardy;
> > (ii) serious impairment to bodily functions; or
> > (iii) serious dysfunction of any bodily organ or part.

Importantly, a hospital's duty to stabilize is not triggered "[a]bsent actual knowledge of an emergency medical condition." *Hines*, 827 F. Supp. at 431. As explained by the Sixth Circuit, "If the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition." *Cleland*, 917 F.2d at 271.

According to Jewish, summary judgment is warranted with respect to Plaintiff's EMTALA claim because Plaintiff has failed to establish either: 1) that Jewish failed to provide appropriate screening based on Pillow's financial status; or 2) that Jewish failed to provide necessary stabilizing treatment for Pillow's emergency medical condition. In response, Plaintiff argues that: 1) Jewish failed to provide appropriate screening insofar as Drs. Brady and McGann should have conducted more comprehensive diagnostic testing before arriving at their diagnoses; and 2) Pillow suffered from an emergency medical condition requiring stabilizing treatment insofar as he complained of "severe pain" within the meaning of 42 U.S.C. § 1395dd(e)(1).

In support of her argument that Jewish failed to provide appropriate medical screening, Plaintiff cites 42 U.S.C. § 1395dd(a)'s requirement that an "appropriate medical screening" must be designed "to determine whether or not an emergency medical condition exists." According to Plaintiff, the testimony of her expert Dr. Sorabh Khandelwal clearly establishes that Jewish failed to provide an "appropriate medical screening" because the extent and severity of Pillow's symptoms warranted further diagnostic testing. Although Plaintiff may well be correct that further diagnostic testing was advisable, her failure to present evidence demonstrating that the

diagnostic screening that Pillow *did receive* was "in any way different than would have been offered to any other patient," *Cleland*, 917 F.2d at 269, is fatal to her claim that Jewish failed to provide an appropriate medical screening. Accordingly, summary judgment is warranted on Plaintiff's claim that Jewish violated EMTALA by failing to provide an appropriate medical screening.

With respect to her claim that Jewish failed to provide necessary stabilizing treatment, Plaintiff argues that Pillow's complaints of "severe and acute pain" were sufficient to provide Jewish with actual knowledge that Pillow was suffering from an emergency medical condition. In response, Jewish argues that, because it is undisputed that "neither Jewish… employees nor any of the emergency room physicians… had knowledge of any life-threatening condition, including the pulmonary embolism…," (Response, DN 44, at 4), Jewish cannot be deemed to have had actual knowledge that Pillow suffered from an emergency medical condition.

In order to successfully establish her claim that Jewish failed to provide necessary stabilizing treatment, Plaintiff must demonstrate that Jewish had actual knowledge that Pillow was suffering from:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-
>
>> (i) placing the health of the individual… in serious jeopardy;
>> (ii) serious impairment to bodily functions; or
>> (iii) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1)(A). Given the fact that Pillow was diagnosed with pneumonia on both of his visits to Jewish's emergency department, the Court concludes that Jewish did not have actual knowledge that Pillow was suffering from an emergency medical condition. Critically, Plaintiff has failed to establish that the severity of the pneumonia with which Pillow was

11

diagnosed constituted a condition which, in the absence of immediate medical attention, could reasonably have been expected to result in: (i) placing Pillow's health in serious jeopardy; (ii) serious impairment to Pillow's bodily functions; or (iii) serious dysfunction of any of Pillow's bodily organs or parts. Because there is no evidence that Jewish was aware of any medical condition other than pneumonia,[3] the Court concludes that Jewish did not fail to provide necessary stabilizing treatment. Accordingly, summary judgment is warranted on Plaintiff's claim that Jewish failed to provide necessary stabilizing treatment.

**ii. UMC's Motion for Summary Judgment**

*a. Medical Negligence*

UMC argues that summary judgment is warranted with respect to Plaintiff's medical negligence claim because: 1) Dr. McKnight is not an actual agent of UMC, but is instead an independent contractor; and 2) UMC did not engage in conduct inducing Pillow to believe that Dr. McKnight was the ostensible agent of UMC.[4] In support of this argument, UMC relies on:

1) the Emergency Professional Services Agreement ("EPSA") between UMC, University of Louisville School of Medicine, and University Emergency Medical Associates[5]; and

2) the Consent and Acknowledgement Form ("Consent Form") signed by Pillow upon admission to UMC.

Specifically, UMC cites the following language from the EPSA:

> Department and all Physicians are performing services and duties under this Agreement as independent contractors and not as employees, agents, partners of, or joint ventures with Hospital.

---

[3] Indeed, Plaintiff's own expert conceded that Jewish was unaware that Pillow was suffering from a pulmonary embolism. (Khandelwal Deposition, DN, at 162:1–6) ("Obviously they didn't [think Pillow suffered from a pulmonary embolism], because they didn't diagnose him for one.")

[4] Because Plaintiff fails to address UMC's arguments regarding ostensible agency, the Court will restrict its analysis to determining whether Dr. McKnight was the actual agent of UMC.

[5] University Emergency Medical Associates ("UEMA") is is an independent group of emergency room physicians responsible for treating patients who present for medical care at UMC's emergency department.

12

(Emergency Professional Services Agreement, DN 18-4, at 6). According to UMC, "This section clearly establishes that, as a Resident with the Department, Dr. McKnight is an independent contractor." (Mot. for Summ. J., DN 18-1, at 7). Similarly, UMC cites the following language from the Consent Form:

> Physicians are not hospital employees and the hospital is not responsible for the actions of physicians. I understand and agree that I may require the services of physicians or groups of physicians who are not hospital employees…

(Consent and Acknowledgement Form, DN 18-3, at 1). UMC argues that, to the extent Pillow specifically acknowledged that "emergency room physicians" such as Dr. McKnight "are not hospital employees," Plaintiff cannot now maintain that Dr. McKnight was an agent of UMC.

In response, Plaintiff cites *City of Somerset v. Hart*, 549 S.W.2d 814 (Ky. 1977), in support of her argument that Dr. McKnight was the dual agent of UMC and UEMA. In *City of Somerset*, the plaintiff sued the hospital where he had undergone bladder surgery after postoperative complications led to the discovery that a scalpel was left in his abdomen during the surgery. As detailed by the court, the relevant facts were as follows:

> The Hospital supplied the operating room and staffed it with a supervisor, a scrub nurse and a circulating nurse. This staff was selected, paid and generally supervised by the Hospital. The staff was required to set up the room, lay out the instruments, including scalpels with blades attached, hand instruments to the surgeon and generally assist him during the operation. The operating surgeon was authorized to supervise and direct the staff in the operating room.
>
> The Hospital supplied the instruments in the form of an instrument pack. This pack is a set of instruments of a type and number prescribed by the Hospital sufficient to perform the operation scheduled by the surgeon. The packs are assembled by employees of the Hospital. The rules of the Hospital do not require that the number of instruments be verified by their operating room staff by either a preoperation or preclosing instrument count. However, the Hospital does require its operating room staff to make a post operation count at the time the instruments are cleaned, to keep count of the number of scalpel blades used and to report any deficiency. No such report was made here either to the hospital administration or

> the operating surgeon. If a scalpel blade becomes dull during an operation it is the duty of the operating room staff on request of the surgeon to obtain a new blade, replace the dull one on the handle and dispose of the used blade. No one recalls whether such a replacement was made here.

*Id.* at 816. Although negligence on the part of the operating room staff was clear, the hospital argued that "the operating room staff are the borrowed servants of the surgeon" such that it could not be held liable for their negligence. *Id.* In response, the plaintiff argued that "there is distinction between administrative and medical acts, that the Hospital is the master in regard to administrative acts, that the surgeon is the master in regard to medical acts, and that the failure to account for a scalpel blade is an administrative omission chargeable to the Hospital." *Id.*

Ultimately, the court rejected the assumption that "only one of them [the surgeon or the hospital] could have been liable because the hospital employee could not simultaneously have been the servant of both" on the grounds that such an assumption would "ignore the legal principle that a person may be the servant of two masters…" *Id.* at 816–17. As explained by the court:

> Frequently, if not most often, the hospital nurse or other employee who is temporarily lent to the physician or surgeon, in every realistic sense continues to carry on her hospital duties. Her work is of mutual interest to both of two employers, the physician or surgeon and the hospital, and is performed to effect their common purpose. The doctrine of *respondeat superior* is therefore equally applicable to both employers.

*Id.* at 817. Accordingly, the court held that, because "the accurate accounting for scalpel blades is of mutual interest to both the surgeon and the hospital…," and because "the surgeon issued no orders to the operating room staff in regard to the accounting for scalpel blades which conflicted with those of the Hospital," the operating room staff was serving as the dual agents of the hospital and the surgeon. *Id.*

Based on *City of Somerset*, Plaintiff argues that Dr. McKnight must be deemed the dual agent of UMC and UEMA as an "intern"[6] acting in their mutual interest and subject to their mutual control. Specifically, Plaintiff argues that:

> There is no doubt that University Hospital shared the services of the physician and residents. University Hospital and University Emergency Medicine Associates had an agreement regarding the terms and that Agreement clearly provides that both had a right to exercise control over the resident. Undoubtedly while in the hospital Dr. McKnight was subject to University Hospital's control, rules, policies and regulations while serving as a resident, and he was subject to the control and supervision of Dr. O'Brien, the attending physician and member of University Emergency Medicine Associates.

(Response to Mot. for Summ. J., DN 24, at 11).

After careful review, the Court concludes that summary judgment is warranted because Dr. McKnight cannot be deemed the actual agent of UMC. Although *City of Somerset* clearly supports Plaintiff's contention that a person can serve as a dual agent, this does little to resolve the central issue of whether Dr. McKnight was acting as an agent of UMC. In *Nazar v. Branham*, 291 S.W.3d 599 (Ky. 2009), the Kentucky Supreme Court explained that:

> In *City of Somerset*, the court held that where there are facts sufficient to support a dual agency relationship, a surgical nursing staff may be the dual agents of both a surgeon and a hospital. *City of Somerset* did not displace the traditional inquiry required for all agency determinations, but instead was founded upon it: agency relationships are created when one party has the authority to control the details of another's work.

*Id.* at 607. Accordingly, rather than rely exclusively on *City of Somerset*, the Court must focus its attention on whether the facts and circumstances surrounding the relationship between UMC and UEMA (and Dr. McKnight in particular) suggest that Dr. McKnight was the actual agent of UMC under traditional principles of agency.

---

[6] Although Plaintiff attempts to categorize Dr. McKnight as an "intern," the Court notes that a medical resident is a licensed physician and therefore cannot properly be deemed an intern.

Under Kentucky law, "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *McAlister v. Whitford*, 365 S.W.2d 317, 319 (Ky. 1962). Under the common law doctrine of *respondeat superior*, "a principal is vicariously liable for damages caused by torts of… an agent or subagent, other than an independent contractor, acting on behalf of and pursuant to the authority of the principal." *Williams v. Kentucky Dep't of Educ.*, 113 S.W.3d 145, 151 (Ky. 2003). In determining whether a person is acting as another's agent or independent contractor, the following factors must be considered:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
>
> (f) the length of time for which the person is employed;
>
> (g) the method of payment, whether by the time or by the job;
>
> (h) whether or not the work is a part of the regular business of the employer; and
>
> (i) whether or not the parties believe they are creating the relationship of master and servant.

*Sam Horne Motor & Implement Co. v. Gregg*, 279 S.W.2d 755, 756–57 (Ky. 1955). Among these factors, "the chief criterion is the right to control the details of the work." *Sturgill v. Barnes*, 300 S.W.2d 574, 577 (Ky. 1957) Thus, a person will generally be deemed an

independent contractor if he or she "is free to determine how work is done" while "the principal cares only about the end result." *Nazar v. Branham*, 291 S.W.3d 599, 607 (Ky. 2009).

After considering all relevant factors, the Court concludes that Dr. McKnight cannot be deemed the actual agent of UMC. First, the Agreement itself clearly demonstrates that the parties intended to establish an independent-contractor relationship with no control exercised by the hospital over the physicians except "to the extent required by statute, regulation, and the accreditation standards applicable to Hospital." (Emergency Professional Services Agreement, DN 18-4, at § 6.5). Indeed, the Agreement specifically provides that the hospital's responsibility "is limited to establishing the goals and objectives for the [physicians' medical treatment] and requiring that services to be rendered in a competent, efficient, and satisfactory manner in accordance with applicable standards and legal requirements." (Emergency Professional Services Agreement, DN 18-4, at § 6.5).[7] Because "[t]he right to control is considered the most critical element in determining the principal's liability for the tortious acts of an agent," *Brooks*, 289 S.W.3d at 212, and because a person will generally be deemed an independent contractor if he or she "is free to determine how work is done" while "the principal cares only about the end result." *Nazar*, 291 S.W.3d at 607, the hospital's lack of control over the physician's professional duties merits special weight and emphasis.

Second, the degree of skill required of licensed physicians is particularly high and thus is ordinarily executed in the locality without significant control or supervision on the part of hospitals. Third, there can be no question that Dr. McKnight, as a licensed physicians, "is engaged in a distinct occupation." *Sam Horne*, 279 S.W.2d at 756. Finally, hospitals themselves

---

[7] Although it is true that, like Jewish, UMC retains authority to terminate physicians, the circumstances under which termination are appropriate are much more objective and consequently less dependent upon UMC's discretion. Most importantly, unlike Jewish, UMC does not possess the authority to terminate physicians for conduct materially injurious to UMC, as reasonably determined by UMC.

17

are not regularly engaged in the business of providing medical care and treatment, but instead focus exclusively on maintaining the facilities and staff necessary for the performance of medical care and treatment by physicians.

Notwithstanding these considerations, Plaintiff contends that Dr. McKnight must be deemed the actual agent of UMC because the Agreement provides that "Hospital agrees to pay Department… to support operational costs of the Department's programs located at Hospital, inclusive of resident and student teaching programs." (Emergency Professional Services Agreement, DN 18-4, at § 1.1). According to Plaintiff, because UMC indirectly pays Dr. McKnight, it cannot reasonably be disputed that he is acting as its actual agent. However, as correctly noted by UMC, the only relevant consideration is the *method* of payment, not its source. Accordingly, the Court concludes that UMC's indirect payment of Dr. McKnight is insufficient to render him the hospital's actual agent.

Thus, while it is true that UMC supplies the instrumentalities, tools, and place of work, the Court concludes that the relevant factors weigh heavily in favor of concluding that Dr. McKnight was merely an independent contractor. Accordingly, UMC's Motion for Summary Judgment on Plaintiff's medical negligence claim will be granted.

    *b. EMTALA*

UMC argues that summary judgment is warranted on Plaintiff's EMTALA claim because there is no genuine dispute that it complied with the requirements of the statute. According to UMC, Plaintiff has failed to produce evidence that: 1) UMC failed to provide such medical screening as it would have provided any other patient; or 2) UMC failed to provide necessary stabilizing treatment for an emergency medical condition of which they were aware. In response, Plaintiff argues that: 1) UMC failed to provide an appropriate medical screening insofar as they

entrusted Pillow's care exclusively to second-year resident Dr. McKnight without the supervision of his attending physician; and 2) Pillow's complaints of severe pain and labored breathing should have alerted UMC that Pillow was suffering from an emergency medical condition for which stabilizing treatment was necessary.

As was the case with respect to Plaintiff's EMTALA claim against Jewish, Plaintiff's failure to produce evidence demonstrating that the diagnostic screening provided by UMC was "in any way different than would have been offered to any other patient," *Cleland*, 917 F.2d at 269, is absolutely fatal to her claim that UMC did not provide an appropriate medical screening. Accordingly, summary judgment will be entered on this basis.

As for Plaintiff's claim that UMC failed to provide necessary stabilizing treatment, the Court concludes that Pillow's complaints of severe pain and labored breathing were insufficient to provide UMC with actual knowledge that Pillow was suffering from an emergency medical condition. Because actual knowledge of an emergency medical condition is a necessary element of a failure-to-stabilize claim under EMTALA, summary judgment is appropriate.

A separate order will be entered in accordance with this opinion.